## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,          CRIMINAL NO. 16-20622
                                    HON. DENISE PAGE HOOD

v.

TAFARI SPENCE,

                Defendant.

_____/

## ORDER GRANTING DEFENDANT'S
## MOTION TO SUPPRESS [#17]

## I.      BACKGROUND

On August 29, 2016, a Complaint was filed against Defendant Tafari Spence ("Spence").  (Doc # 1)  On September 13, 2016, Spence was charged by Indictment with one count of Felon in Possession of Firearms in violation of 18 U.S.C. § 922(g)(1).  (Doc # 9)  On October 27, 2016, Spence filed a Motion to Suppress Evidence.  (Doc # 17)  The Government filed a Response on December 1, 2016.  (Doc # 21)  Spence filed a Reply on December 15, 2016.  (Doc # 22)

Through the instant Motion, Spence seeks to suppress evidence seized during the warrantless entry and search of his alleged home, located at 8337 Almont Street in Detroit, Michigan.  The evidence seized from the house includes a Glock, Model 27 semi-automatic handgun loaded with eleven live rounds in an

1

extended magazine; an AR-15 magazine; a red dot sight; and a sight magnifier. The Court held an evidentiary hearing on January 25, 2017 and February 1, 2017. The Court heard and has considered testimony from Detroit Police Department ("DPD") Officers Erik Peterson ("Peterson") and Johnathon Gardner ("Gardner"), as well as from Cynthia Moody ("Moody"), David Henderson ("Henderson"), Walter Jackson ("Jackson"), and Steven Mason.  The Court has also reviewed and considered the photo and video exhibits introduced at the hearing.

## II.    FINDINGS OF FACT

On the night of July 31, 2016, DPD Officers Peterson, Jordan Napier ("Napier"), Gardner, and Eric Maxwell ("Maxwell") were on patrol as members of a DPD Tactical Response Unit.  They were specifically deployed to the area around 8337 Almont due to a high rate of gun violence in the area in the prior weeks.  As members of the Tactical Response Unit, the officers were deployed to different areas of the city each day.  Peterson testified that he has been a DPD officer for three years, and that he had patrolled the area around 8337 Almont approximately five times.  Gardner testified that he has been a DPD officer for two and a half years, and that he had never before patrolled the area around 8337 Almont.  The officers testified that they had no familiarity with 8337 Almont.

While on patrol, at approximately 10:00 p.m., the officers observed a group of men drinking beer and playing music near three vehicles in the grass lot just

west of 8337 Almont.  The officers approached the men, and Peterson illuminated them with a handheld flashlight.  Peterson saw Spence wearing a tight white tank top, red gym shorts, and a tether on his right ankle.  Peterson also saw an object shaped like a handgun "swinging in" Spence's front right pocket.  Spence separated from the group and began walking toward 8337 Almont.  As Spence turned to walk toward the house, Peterson again illuminated him with the flashlight and observed the end of a handgun magazine sticking out of Spence's right pocket. Peterson ordered Spence to stop.  Spence then removed a black handgun with an extended magazine from his pocket, as he fled toward the west door of the house. Peterson and Gardner gave pursuit, and as they neared the door, they observed Spence inside the house closing and locking the side door with the handgun still in his right hand.

Peterson ran to the rear of the house to check for a rear door.  There was no rear door.  While at the rear, Peterson observed that the house's electric meter had been removed, and the wires were hanging low.  *See* Gov't's Exh. 4.  According to Peterson and Gardner, the house appeared to be vacant due to untrimmed landscaping, garbage littering the lot, a white van in the back of the lot that appeared abandoned with some flat tires and no license plate, and no lights turned on inside the house.

Peterson returned to the side door, which was now locked. He forced entry into the house without knocking on the door. Gardner followed closely behind. They began to clear the house in search of Spence, while Napier and Maxwell secured the outside of the house. Peterson and Gardner testified that they made the following observations of the interior of the house. They tried to turn on the lights, but there was no electricity. In the kitchen, the officers observed a box of power tools, empty cabinets, and a refrigerator taped closed with what sounded like a rat inside. In the living room, the officers observed some garbage bags that were full, but they did not look inside the bags. They also saw a large sectional couch with some items on it, clothing and property that appeared to belong to a woman, and a hole in the ceiling. In the bathroom, the officers observed a hole in the ceiling, debris on the floor, and a toilet and bathtub that were both full of urine, feces, and other debris. In the northeast bedroom, the officers saw a bed and a dresser.

Peterson and Gardner located Spence lying down on a bed with bed sheets in the southeast bedroom. This bedroom had several pieces of furniture including a dresser, a cabinet, and an older TV. The dressers had several items on top. Gardner testified that there were many personal items on the floor of the bedroom. Peterson testified that Spence told the officers that he lived there. Peterson testified that he did not follow up on that statement because, in his experience, a statement like that is true only "50" percent of the time.

4

Peterson and Gardner handcuffed Spence. Peterson secured Spence in a police car, while Gardner stood by in the house. Peterson testified that he patted Spence down for safety, but that he did not look at Spence's ID (which had the 8337 Almont address) at that time. Peterson testified that he then returned to the house to search for the handgun. Gardner testified that he knew he had to look for the handgun in order to arrest Spence. The officers testified that additional officers responded and came to the scene at some point during the searches.

During this second search, Peterson recovered a red dot sight for a firearm and a sight magnifier from the top of the tall dresser in the southeast bedroom. Gardner advised him of the recovery of an AR-15 magazine from another dresser in the southeast bedroom. Peterson and Gardner continued the search for the handgun, and Peterson found it on the insulation in the attic, on the edge of a hole in the ceiling of the bathroom. He testified that the insulation was wet from an apparent leak, but the handgun was dry and debris-free.

After the officers recovered the handgun, they filmed a re-creation of the recovery inside the house on the personal cell phone of Officer Eric Maxwell, which they then shared amongst each other. The Snapchat video shows various pieces of furniture inside the house, personal belongings, and items hanging on the wall of the southeast bedroom, including a Jamaican flag. Def.'s Exh. 10. Peterson continued searching the house after recovering the handgun, testifying

that he is depicted in a photograph which shows him searching the ceiling inside a closet filled with personal belongings. Def.'s Exh. 4. Peterson testified that this photograph is not of a re-creation.

Cynthia Moody, Spence's mother, testified that Spence has lived at 8337 Almont for 17 years and has never used another address on any identification. Moody's name has been on the deed of the house since 1997. She testified that she visits the house periodically to pick up mail, approximately once per month. Moody visited the house during the summer of 2016 and saw that Spence had building materials and was working on making improvements to the house. She testified that Spence had a fire pit in the front lawn and a generator chained to a tree in the front of the house. Garbage was collected from the house this summer. Spence regularly mowed the lawn. Spence regularly received mail at the house and still does. *See* Def.'s Exh. 11. Moody testified that she went into the interior of the house this summer and saw that Spence had installed a new kitchen sink. *See* Gov't's Exhs. 8B, 8C. She was aware that the roof was damaged, and she testified that it has continued to deteriorate and gotten worse. She was also aware that the bathtub was not functional, but testified that the bathroom sink was. Moody had boxes and bags of her personal belongings in the living room, which she was planning to take with her. These items included clothing, books, cassette tapes, VHS tapes, school trophies, pictures, and figurines. *See* Gov't's Exh. 8A.

Moody testified that most houses in the neighborhood look like theirs and have occupants who are doing the best they can. Some houses in the neighborhood are abandoned, and she testified that they have broken or no windows and one can look right inside them.

David Henderson, Spence's friend, testified that he has been visiting Spence at 8337 Almont since they were kids. He visited the house four to five times per week during the summer of 2016. He mowed the lawn with Spence several times during the summer of 2016. He also picked up garbage from the lot with Spence several times per week. Henderson testified that Spence put a tarp on the roof to cover the holes, but had not fixed the roof. *See* Gov't's Exh. 3. He also testified that the white van in the driveway belonged to one of their friends. Henderson testified that they mostly spent time inside Spence's bedroom, which had a bed, a dresser, a mirror, a TV, Spence's clothing and shoes, a radio, a DVD player, pictures of his family and a Jamaican flag hanging on the wall, a chair, and a working mini refrigerator. *See* Def.'s Exhs. 5-7. Spence and Henderson would drink and watch TV in the bedroom. They used the generator to power the appliances in the bedroom, and they went down the street when they needed to use the bathroom.

Walter Jackson, Spence's friend, also lives on Almont Street. He testified that many of the occupied houses in the neighborhood are not in good condition,

but residents are often seen going in and out and have fixed or covered their windows.  There are also several abandoned houses in the neighborhood with no doors, and broken windows.  Some have been burned down.

Jackson was one of the 5 to 6 men lounging next to 8337 Almont when the police officers arrived.  It was dark, but the officers did not turn their overhead lights on.  They were all ordered to put their hands on the police cars.  Several officers went inside 8337 Almont after kicking the door open.  Jackson testified that the officers stayed in the house for about 15 minutes.  The men outside were patted down, but the officers did not find anything.  Jackson testified that after the officers put Spence in the police car, they went back inside the house and stayed inside for another 15 to 20 minutes.

## III.   ANALYSIS

### A. Initial Entry Into 8337 Almont

The Fourth Amendment prohibits unreasonable searches and seizures.  U.S. Const. amend. IV.  "The chief evil that the Fourth Amendment protects against is the physical entry of the home," and police are generally required to "obtain a warrant based upon a judicial determination of probable cause prior to entering a home."  *Johnson v. City of Memphis*, 617 F.3d 864, 867-68 (6th Cir. 2010) (internal quotations omitted).    Warrantless searches are presumptively unreasonable under the Fourth Amendment.  *Payton v. New York*, 445 U.S. 573,

586 (1980).   The presumption can be rebutted only by a few specifically established and well-delineated exceptions.   The Government bears the burden of establishing the legitimacy of its warrantless search, and that burden is a heavy one.   *United States v. Akrawai*, 920 F.2d 418, 421 (6th Cir. 1990); *Welsh v. Wisconsin*, 466 U.S. 740, 750 (1984).

The first exception to the warrant requirement at issue here is the existence of "exigent circumstances."   "Exigent circumstances arise when an emergency situation demands immediate police action that excuses the need for a warrant." *Johnson v. City of Memphis*, 617 F.3d 864 (6th Cir. 2010).   The Sixth Circuit has recognized four situations that may rise to the level of exigency:   "(1) hot pursuit of a fleeing felon, (2) imminent destruction of evidence, (3) the need to prevent a suspect's escape, and (4) a risk of danger to the police or others."   *Thacker v. City of Columbus*, 328 F.3d 244, 253 (6th Cir. 2003) (internal quotations omitted).

As the Sixth Circuit has explained,

> [t]he "hot pursuit" justification for warrantless entry into a house derives primarily from the Supreme Court cases of *Warden, Maryland Penitentiary v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), and *United States v. Santana*, 427 U.S. 38, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976).   In *Hayden*, upon being informed by witnesses that an armed robber had entered a home minutes earlier, the police pursued the suspect into the home without first attempting to secure a warrant.   *Hayden*, 387 U.S. at 297, 87 S.Ct. at 1645.   Because "[s]peed here was essential" in order "to find a suspected felon, armed, within the house into which he had run only minutes before the police arrived," the Court concluded that the warrantless entry was

reasonable.  387 U.S. at 299, 87 S.Ct. at 1646.  The Court reasoned that "[t]he Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others."  387 U.S. at 298-99, 87 S.Ct. at 1646.

Similarly, in *Santana*, the Court upheld a warrantless entry into a home where the defendant, a suspect in an ongoing drug transaction, had been standing in the doorway with a brown paper bag in her hand, but had retreated into the vestibule as police officers pulled up to her house and shouted "police" while exiting their vehicle.  *Santana*, 427 U.S. at 40, 43, 96 S.Ct. at 2408, 2410.  The Court found that the officers' entry through the open door of the defendant's house constituted "hot pursuit," and thus was permitted both under *Hayden* and in light of the officers' "realistic expectation that any delay would result in destruction of evidence."  427 U.S. at 42-43, 96 S.Ct. at 2409-10.  Moreover, because the defendant "was exposed to public view" in the doorway of her house, the Court found that she was "not in an area where she had any expectation of privacy."  427 U.S. at 42, 96 S.Ct. at 2409.  Noting that public warrantless arrests were permitted under *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), the *Santana* Court reasoned that it would be anomalous to allow a suspect to evade a lawful public arrest simply by fleeing into a private residence.  427 U.S. at 42, 96 S.Ct. at 2409.

*United States v. Rohrig*, 98 F.3d 1506, 1515–16 (6th Cir. 1996).

In this case, the officers had probable cause to arrest Spence for a felony in a public place.  Peterson ordered Spence to stop after observing:  (1) Spence wearing a tether on his right ankle; (2) an object weighing his gym shorts down, shaped like a handgun; (3) the end of what appeared to be a handgun magazine sticking out of his right pocket; and (4) Spence removing a handgun with an extended magazine from his pocket, as he fled toward the house.  Like the defendant in *Santana*, Spence tried to evade a lawful public arrest simply by fleeing into a private

10

residence that he was standing next to.  Peterson and Gardner then ran after Spence and observed him locking the side door with the handgun still in his right hand. Peterson tried to gain entry into the house via another door before forcibly entering through the locked side door in hot pursuit of Spence, a fleeing felon.  In light of these circumstances, coupled with the fact that the officers had no way of knowing if there were additional people or weapons inside the house, the Court concludes that the officers acted reasonably when they initially entered 8337 Almont.  As the court noted in *Hayden*, "only a thorough search of the house for persons and weapons could have insured that [the defendant] was the only man present and that the police had control of all weapons which could be used against them or to effect an escape."  387 U.S. at 299.

## B. Search Incident to Arrest

Police may conduct warrantless searches incident to arrest of the person arrested, as well as of the area from which the person arrested might obtain weapons or evidentiary items.  *See Chimel v. California*, 395 U.S. 752, 763 (1969). As the Supreme Court has explained,

> [w]hen an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape. Otherwise, the officer's safety might well be endangered, and the arrest itself frustrated.  In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction.  And the area into which an arrestee might reach in order to grab a weapon or

11

evidentiary items must, of course, be governed by a like rule. A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence.

There is no comparable justification, however, for routinely searching any room other than that in which an arrest occurs—or, for that matter, for searching through all the desk drawers or other closed or concealed areas in that room itself.

*Id.* at 762-63. Incident to an arrest, police may also, "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched. *Maryland v. Buie*, 494 U.S. 325, 334 (1990).

The Fourth Amendment also permits officers to conduct a limited "protective sweep" in conjunction with an in-home arrest when the officers have "a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant[] the officer[s] in believing that the area [to be] swept harbor[s] an individual posing a danger to the officers or others." *Id.* at 327. Such a "protective sweep" is a quick search that is "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Id.*

In this case, Peterson and Gardner located and arrested Spence in the southeast bedroom, before viewing or seizing any evidence. Peterson then left the

house with Spence in order to secure him in a police car, while Gardner remained inside the house. Peterson then entered the house a *second* time without a warrant specifically to search for the handgun. He recovered a red dot sight for a firearm and a sight magnifier from the top tall dresser of the southeast bedroom. Gardner then told him that he recovered an AR-15 magazine from another dresser in the southeast bedroom. The officers continued the search, and Peterson eventually found the handgun on the insulation in the attic, on the edge of a hole in the ceiling of the bathroom.

Based on these facts, the Court finds that these items were not seized in conjunction with Spence's arrest, and they were not found during a protective sweep. The search for these items and their seizure all took place after the house had been initially cleared, and after Spence was already arrested and secured no longer posing any threat to the officers.

## C. Second Entry Into 8337 Almont and Subsequent Search and Seizures

Under certain circumstances, police may seize evidence in plain view without a warrant. *See Horton v. California*, 496 U.S. 128, 134 (1990). "Where the initial intrusion that brings the police within plain view of such an article is supported, not by a warrant, but by one of the recognized exceptions to the warrant requirement, the seizure is also legitimate. Thus the police may inadvertently come across evidence while in 'hot pursuit' of a fleeing suspect." *Id.* at 135. The

"plain-view" doctrine authorizes warrantless seizures where: (1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be viewed; (2) the item is in plain view; and (3) the incriminating character of the item is immediately apparent. *Id.* at 136.

The officers recovered a red dot sight for a firearm and a sight magnifier, in plain view, from the top tall dresser of the southeast bedroom during the second search. The problem for the Government is that the officers must not have been violating the Fourth Amendment at the time that they observed the evidence in plain view and seized it. Had the officers observed these items to be in plain view during their initial lawful entry into 8337 Almont, while in hot pursuit of Spence or while arresting Spence, their warrantless seizure of these items would have been valid. However, the evidence shows that the officers observed and seized these items during their second warrantless search conducted specifically to look for the handgun—after the hot pursuit of the fleeing Spence was over, after the officers had cleared the house following the initial entry, and after Spence was arrested and secured in the police car not posing a threat.

The Court next turns to whether the officers acted reasonably when they entered and searched 8337 Almont a second time without a warrant. The Government argues that the evidence should not be suppressed because the officers reasonably believed that 8337 Almont was abandoned, and that Spence had no

legitimate expectation of privacy in the house. The Government relies on the officers' observations of the exterior and interior of the house. Spence argues that the officers cannot rely on their observations of the interior of the house because their initial entry was not justified by any exigent circumstances. Since the Court has concluded that the officers' initial entry into the house was lawful, as discussed above, the Court will take into account the officers' observations of both the exterior and interior of the house in determining whether it was abandoned property such that the officers did not need a warrant to search for and seize evidence.

"[I]f an item has been abandoned, n[o] Fourth Amendment interest is implicated, and neither probable cause nor a warrant is necessary to justify seizure." *Texas v. Brown*, 460 U.S. 730, 748 (1983) (Stevens, J., concurring in judgment). The Sixth Circuit has not specifically addressed the warrantless search of a house that officers believed to have been abandoned. The Government relies on two cases from other circuits.

In the first case, *United States v. Harrison*, the Third Circuit found that a person could, through his acts or omissions, "manifest an intent to relinquish his legitimate expectation of privacy in his real property." 689 F.3d 301, 309 (3d Cir. 2012). The court warned, however, that this would be difficult to show and would require "a careful analysis of all the facts and circumstances of a particular case."

*Id.* "Before the government may cross the threshold of a home without a warrant, there must be clear, unequivocal and unmistakable evidence that the property has been abandoned. Only then will such a search be permitted." *Id.* Turning to the facts of the case, the court concluded that, based on the totality of the circumstances, the officers were reasonable in their belief that the house at issue was abandoned. *Id.* at 310. In that case, the court took the following facts into account regarding the exterior of the house: the exterior of the house was in severe disrepair; there was trash strewn about; the lawn was overgrown with weeds; windows on both levels were either boarded up or exposed; and the front door was left open, and the lock may have been broken. The court noted that, regardless, this would not have been sufficient to find that the officers were reasonable in their belief that the house was abandoned, observing:

> It is unreasonable to assume that a poorly maintained home is an abandoned home. A one-time look at [the house] in its dilapidated condition would not justify the police entering it without a warrant because a reasonably cautious officer would only assume that the person who occupied the home did not maintain it as they should, not that they had clearly manifested an intent to relinquish their expectation of privacy in the house. There simply is no "trashy house exception" to the warrant requirement.

*Id.* at 311. The court found it significant that the officers in *Harrison* knew that the interior condition of the house matched the exterior because they had been there before. There were no furnishings other than a single mattress, and no evidence of electricity or running water. Police had observed squatters on several occasions,

and human waste filled the bathtub and toilets.  Significantly, the officers had observed the house and "its unchanging, uninhabitable condition over several months," and they knew it to be a drug den.  *Id.* at 311-12.

In the second case relied upon by the Government, *McKenney v. Harrison*, the Eighth Circuit found that the totality of the circumstances supported an objectively reasonable belief by the officers that the house was abandoned.  635 F.3d 354, 359 (8th Cir. 2011).  The court relied on the following facts:  the yard was unkempt; the fence was incomplete and falling apart; there were no vehicles parked in the driveway; no one responded when the officers knocked on the front door; the back door was open three or four inches; through the open door, the officers saw that the kitchen cabinets were open and empty; the refrigerator was open, empty, and pulled away from the wall; there was no furniture or personal effects; and there were no lights on, sound from appliances, or indications of electrical power.  *Id.*

Spence directs the Court to a New Jersey Supreme Court case, *State v. Brown*, in which the court identified some factors to be considered in determining whether an officer had an objectively reasonable belief that a building is abandoned:  whether the officer examined readily available records on ownership of the property; the property's exterior and interior conditions; whether the putative owner or lessee has taken measures to secure the building from intruders; and the

officer's personal knowledge of the particular building and the surrounding area. 216 N.J. 508, 533-34 (2014). The *Brown* court noted that "those living in impoverished squalor are entitled to the same privacy protections under the Constitution as are individuals who reside in gated mansions." *Id.* at 522.

In the case at hand, the officers made the following observations: untrimmed landscaping; some garbage on the lot; a white van in the back of the lot with some flat tires and without a plate; that the electric meter had been removed; several holes in the ceiling; a refrigerator taped closed with what sounded like a rat inside; no evidence of electricity; clothing and property that appeared to belong to an older woman; and that the toilet and bathtub were full of apparent urine and feces. The officers also observed pieces of furniture, many personal belongings, and a crate of power tools in the kitchen.

Peterson testified that he made a decision not to seek a search warrant because he determined that the house was abandoned. He testified that he has received no formal training regarding abandoned homes, but that he has driven by thousands of abandoned homes and has been in the interior of abandoned homes hundreds of time. Peterson testified that he could have run a check for residents of the house and state identifications related to 8337 Almont on his vehicle computer, but that he did not do so. Gardner testified that he recalls contacting his supervisor, but that he did not initiate any inquiry to determine any possible

residents of the house, and that he made no attempt to secure a search warrant because he did not think he needed one for a vacant house. The officers summarily disregarded Spence's claim that he lived there.

The Court finds that, based on the totality of the circumstances, the officers were not reasonable in their belief that 8337 Almont was abandoned. The officers had not previously observed 8337 Almont and had no prior knowledge of the property. The officers did not review readily available ownership records or Spence's identification. Photographs of the house's exterior introduced by the Government show the following: a reasonably kept front yard; a garbage bin left in the front for collection; intact, closed windows with bars; closed doors with bars; and a white van parked in the driveway. Gov't's Exhs. 1, 2, 7. The van parked in the driveway, the garbage bin out for collection, as well as the furnishings, clothing, and personal property inside the house are all evidence of habitation. Spence's bedroom furnishings and belongings are also indications that the house was not abandoned. The closed doors and windows with bars are evidence that the putative owner or lessee had taken measures to secure the house from intruders.

The Government has not shown that the officers observed clear, unequivocal and unmistakable evidence that the home had been abandoned, and the Court concludes that the Government has not met its high standard. In this case, based

on a one-time look at the exterior and interior of 8337 Almont, a reasonably cautious officer would have perhaps assumed that the occupant of the house was living in impoverished conditions, but not that he had clearly manifested an intent to relinquish his expectation of privacy in the home. Having already cleared the house and arrested Spence, and having at least five officers on the scene, a reasonably cautious officer would have then obtained a search warrant in order to return to the house to search for the handgun.

### D. Exclusionary Rule

The Government argues that even if the officers' belief that the house was abandoned was not reasonable, suppression is not warranted here because the officers' conduct was not deliberate, reckless, or grossly negligent.

The judicially-created exclusionary rule is designed to safeguard Fourth Amendment rights through its deterrent effect. *Herring v. United States*, 555 U.S. 135, 139-40. In deciding whether to apply the rule, courts weigh the benefits and costs of deterrence. *Id.* at 141. The benefit of some incremental deterrence must be weighed against the possibility of letting a guilty and possibly dangerous defendant go free. *Id.* A court should consider the flagrancy of the police misconduct, and evidence should be excluded only if the officer may properly be charged with knowledge that the search was unconstitutional. *Id.* at 143. The pertinent analysis of deterrence and culpability is objective, and the question is

whether a reasonably well trained officer would have known that the search was illegal in light of all the circumstances. *Id.* at 145.

The Court finds that the officers in this case, having already cleared the house and arrested Spence, should have known that reentering the house to look for the handgun was a violation of the Fourth Amendment. There is no reason why the officers could not have secured a search warrant to return to the house in search of evidence. Given that implicated here are the important and legitimate expectations of privacy of impoverished residents in their homes, the Court will apply the exclusionary rule.

## IV.   CONCLUSION

For the reasons set forth above,

IT IS ORDERED that Defendant's Motion to Suppress [#17] is GRANTED. The Glock, Model 27 semi-automatic handgun loaded with eleven live rounds in an extended magazine; the AR-15 magazine; the red dot sight; and the sight magnifier seized from 8337 Almont are suppressed.

IT IS FURTHER ORDERED that a pretrial conference is set for March 16, 2017 at 2:30 p.m..

21

IT IS FURTHER ORDERED that a jury trial is set for March 27, 2017 at

9:30 a.m..

> S/Denise Page Hood
> Denise Page Hood
> Chief Judge, United States District Court

Dated:  March 6, 2017

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 6, 2017, by electronic and/or ordinary mail.

> S/LaShawn R. Saulsberry
> Case Manager

22